IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Regina L. Elmore,              )     C. A. No. 2:07-1328-MBS-RSC
                               )
          Plaintiff,           )
                               )
     -versus-                  )     **REPORT AND RECOMMENDATION**
                               )
Aaron Rents, Inc. d/b/a Aaron  )
Sales and Lease Ownership,     )
                               )
          Defendant.           )

     This employment gender discrimination case alleging
violations of Title VII, 42 U.S.C. § 2000e et seq., is before
the undersigned United States Magistrate Judge for a Report and
Recommendation on the defendant's motion for summary judgment.
28 U.S.C. § 636(b).

     The defendant filed a motion for summary judgment on
February 14, 2008. The plaintiff opposed the motion on March 3,
2008, and the defendant filed a reply on March 13, 2008. Oral
argument on the motion was had before the undersigned on April
10, 2008. Hence it appears that consideration of the motion is
appropriate.

     On May 9, 2007, Plaintiff, Regina Elmore, filed the instant
action against her former employer, Aaron Rents, Inc., d/b/a
Aaron Sales and Lease Ownership, and alleged that she was
subjected to illegal discrimination based on her gender,
specifically relating to Aaron's failure to promote her to a

1

general manager's (gm) position, a claim that she was
constructively discharged, a claim that she was subjected to a
hostile environment, and a claim that she was retaliated against
for filing a complaint regarding such discrimination, all in
violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000e et seq.  The plaintiff also brought an age discrimination
claim which she later dismissed[1].

## ASSERTED GROUNDS FOR SUMMARY JUDGMENT

Defendant contends that it is entitled to judgment as a
matter of law for the following reasons:

1)  Aaron asserts that it is entitled to summary judgment on
Plaintiff's gender discrimination claim and retaliation claim
under Title VII because it has articulated legitimate,
non-discriminatory reasons for not promoting Plaintiff to the
position of gm, and Plaintiff cannot show that these reasons are
pretextual.

2)  Aaron asserts that it is entitled to summary judgment on
Plaintiff's claim of constructive discharge because Plaintiff
cannot show that the action complained of was deliberately done;
and that her working conditions were intolerable.

---

[1] Plaintiff also agreed that no breach of contract claim
exists and that she did not intend to allege that she was denied
equal pay as compared to her male counterparts or that she was
discharged in violation of public policy.

2

## SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court first must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. Celotex Corp. v. Cattrett, 477 U.S. 317 (1986). All evidence should be viewed in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-23 (4th Cir. 1990). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. CenTra, Inc., 947 F.2d 115, 119 (4th Cir. 1991); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). Unsupported speculation is not enough to withstand a motion for summary judgment. Ash v. United Parcel

3

Service, Inc., 800 F.2d 409, 411-12 (4th Cir. 1986). Indeed, the court should draw reasonable inferences on behalf of the non-moving party, but it must not slip into "sheer speculation." The court may not move beyond inference and into the realm of mere conjecture. Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 242 (4th Cir. 1982).

## GENDER DISCRIMINATION

Plaintiff Elmore alleged that Defendant Aaron wrongfully failed to promote her to gm on account of her female gender in violation of Title VII. Title VII provides, inter alia, that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-(2)(a)(1).

To prevail on her gender discrimination claim, Plaintiff must prove by a preponderance of the evidence that "but for" the employer's motive to discriminate against her because of her sex the adverse employment actions about which she complains, her non-selection for promotion, would not have occurred. See, Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995); EEOC v. Clay Printing Co., 955 F.2d 936, 940 (4th Cir. 1992).

It is undisputed that this case does not involve direct evidence of discrimination. Accordingly, the court analyzes

4

Plaintiff's claims under the now-familiar <u>McDonnell Douglas v.</u> <u>Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting scheme. In the context of a failure-to-promote claim, Plaintiff must show: (1) that she is a member of a protected class; (2) that she applied for and was qualified for a job for which the employer was seeking applicants; (3) that despite her qualifications, she was rejected; and (4) that, after her rejection, the position remained open and the employer continued to seek applicants from persons with her qualifications.  See, <u>McDonnell Douglas</u>, 411 U.S. at 802.

If this burden is met, a rebuttable presumption of discrimination then arises and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment decision.  <u>St. Mary's Honor</u> <u>Center v. Hicks</u>, 509 U.S. 502, 506-08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); <u>Hill v. Lockheed Martin Logistics Mgmt.,</u> <u>Inc.</u>, 354 F.3d 277, 285 (4th Cir. 2004).

If the employer does so, the ultimate burden falls on the plaintiff to establish "that the legitimate reasons offered by the defendant were not its reasons, but were a pretext for discrimination."  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier

of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. (quoting Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

## **RETALIATION**

Plaintiff also claimed she was not promoted and constructively discharged in retaliation for her having engaged in activity protected by Title VII. To establish a prima facie case of retaliation, a plaintiff must prove three elements: (1) that she engaged in protected activity, (2) that an adverse employment action was taken against her, and (3) that there was a causal link between the protected activity and the adverse employment action. See, Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir.), cert. denied, 519 U.S. 818, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996). Under the burden-shifting scheme, if Plaintiff succeeds in proving a prima facie case, the burden of going forward shifts to Defendant to provide evidence of a legitimate non-discriminatory reason for taking the adverse employment action. See, e.g., Matvia v. Bald Head Island Manag., 259 F.3d 261, 271 (4th Cir. 2001); Smith v. First Union Nat'l Bank, 202 F.3d 234, 248 (4th Cir. 2000). Should Defendant articulate a non-discriminatory reason, the burden then shifts back to Plaintiff to demonstrate that Defendant's proffered reason is a pretext for retaliation. Smith, 202 F.3d at 248.

6

To do so, Plaintiff must demonstrate, through either direct or circumstantial evidence, "both that the [proffered nondiscriminatory] reason was false, and that discrimination was the real reason." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). In applying St. Mary's, the Fourth Circuit has held "that to survive a motion for summary judgment under the McDonnell Douglas paradigm the plaintiff must do more than merely raise a jury question about the veracity of the employer's proffered justification. The plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action." Vaughan v. The Metrahealth Cos., 145 F.3d 197, 202 (4th Cir. 1998); Smith, 202 F.3d at 249. As such, in order to avoid summary judgment, Plaintiff must present some evidence, either direct or circumstantial, that Defendant's stated reason for terminating Plaintiff was a pretext for retaliation.

Plaintiff also claimed that the defendant subjected her to a hostile environment in retaliation for her complaint of gender discrimination. The prima facie case of such a claims consists of the following: (1) the plaintiff engaged in protected activity; (2) the plaintiff was subjected to unwelcome harassment; (3) the unwelcome harassment was causally connected

7

to the plaintiff's protected activity; (4) the harassment was severe and pervasive; and (5) a basis exists for imputing liability to the employer.    Fleming v. South Carolina Dep't of Corrections, 952 F.Supp. 283 (D.S.C. 1996); see also, Davis v. California Dep't of Corrections, 1996 WL 271001, at 11 (E.D.Cal. Feb. 23, 1996) (plaintiff must meet following to make a prima facie case for retaliatory hostile environment: conduct reflecting retaliatory animus; that is unwelcome to recipient; that subjectively and objectively creates severe and pervasive hostility in the working environment; and imputed liability).

## FACTS

The facts either undisputed or as presented by the plaintiff, with all reasonable inferences drawn in favor of the plaintiff as the nonmoving party, to the extent supported by the record, are as follow.

Defendant Aaron Rents, Inc., is a corporation having a national retail chain of stores which rents, leases, and sells residential and office furniture. (Pl.'s Mem. at 1; Def.'s Mem. at 2).  Plaintiff Regina Elmore, a female, began working at Aaron's Kissimmee, Florida store as an accounts advisor on January 16, 2002.  (Pl.'s Dep. at 77-78; Def's Mem at 2). Shortly thereafter, she was promoted to the position of customer accounts manager (cam) and worked in that position for one year until she resigned to seek medical treatment.  Thereafter she

8

returned to the defendant's employ and was transferred to its store in St. Cloud, Florida, where she was promoted to sales manager. (Pl.'s. Dep. at 79-80). Plaintiff had no disciplinary problems while she was employed in Florida.

In August, 2003, Plaintiff was promoted to a gm position in North Charleston, South Carolina. (Pl.'s Dep. at 85). Plaintiff's Florida supervisor warned her that the North Charleston store would be a challenge to manage because it was experiencing many problems; the store had problems ranging from sales and profits to collections and untrained sales personnel. (Pl.'s Dep. at 93, 134; Pl.'s Ex. 1). It also appears that the store was in a poor location.[2]

Plaintiff's primary job duties required her to adequately perform all the responsibilities listed within the Pathway Operations Manual. (Pl.'s Dep. at 96-97). Those duties included achieving planned growth and profit goals, training and developing skills in all employees, keeping track of store finances, maintaining the store's physical environment, controlling inventory including ensuring all returned merchandise was certified, and ensuring execution of company guidelines and policies. (Pl.'s Dep. at 97; Def.'s Ex. 7 at 4).

_____

[2] After the plaintiff went to North Charleston, the defendant made plans to move its North Charleston store to a better location. (Sparks Dep. at 21; Pl.'s Ex. 3).

9

Plaintiff also knew that her performance would be based on whether she met the store goals based on factors listed in monthly Store Performance Reports. (Pl.'s Dep. at 102, 108; Pl.'s Ex. 1). The factors used to evaluate employee performance in the Store Performance Report included: "the amount of revenue the store collected each month as compared with the divisional average[3], the pretax profit percentage of the store, the net revenue of the store, the number of monthly customer deliveries as compared with the divisional average, the number of new customer agreements the store entered into each month, and the percentage of month-end non-renewal customers as compared with the divisional average.[4]  (Pl.'s dep. at 102-08; Pl.'s Ex. 1).

James Mahaffey, Phil Bolini, Tom LNU, and finally Shawn Sparks were Plaintiff's regional managers in her new store. During the seven months preceding Plaintiff's management the store was not profitable. (Pl.'s Ex. 1). During Plaintiff's tenure as gm, she made changes to the store and, on average, the store was profitable. (Pl.'s ex. 1; Sparks dep. at 46-8). However, while the store did turn a profit on average, it was not profitable enough to satisfy management. The store profitability

_____

[3]  Revenue collected analyzes the amount of revenue that the defendant actually collects from its customers each month.

[4]  The month-end non-renewals is based on the number of past-due customers in each store so that the lower percentage of month-end non-renewal customers, the better.

10

based on its revenue was considered "not an acceptable level of profit."[5]  (Sparks dep. at 48).  Further, Plaintiff's percentage of revenue collected[6] was below the company's division average and her write-offs were higher than the division average. (Sparks dep. at 49).  Sparks testified that if the plaintiff had "performed at company level or company standard or better in write-offs and the percent of revenue collected, that would have equated out to another 4 to 5 percent in profit."  (Def.'s dep. at 49).

Around June, 2004, ten months after Plaintiff became the gm, Sparks told her that her store was not performing at the required level and, as a result, he placed Plaintiff on a "60 Day Action Plan".  (Pl.'s Dep. at 131-134; Spark's Decl. ¶ 17; Pl.'s Dep. at 131-34; Pl.'s ex. 1; Sparks Dep. at 49).  Plaintiff was provided a written copy of her action plan which indicated which areas she needed to improve.  (Pl. Dep. at 133).  The following month, Sparks was promoted to Regional Manager for the South Carolina Coastal Region.

During the 60 day action plan, the store's percentage of revenue collected remained below the regional average in two out

---

[5] A pretax profit percentage of less than 7% a month was considered unacceptable. (Pl. Dep., p. 104-05, Ex. 8; Sparks Dec. ¶ 15, Def. ex. C).

[6] Revenue collected analyzes the amount of revenue that the defendant actually collects from its customers each month.

of the three months. (Pl.'s Ex. 1). The store's percentage of month-end non-renewals remained above the regional average during all three months; the store's customer deliveries were below the regional average during all three months, and the total number of new agreements reached its lowest monthly point during Plaintiff's tenure as gm. (Pl.'s Ex. 1).

Plaintiff's understanding of the significance of being put on the action plan was, "[i]n a nutshell I had 60 days to turn it around, and at that point they would discuss it." (Pl.'s dep. at 132). Plaintiff deposed that she did not receive any feedback on her performance from "anyone" during the action plan or after the 60 day period expired. (Pl.'s Dep. 134). However, two weeks after Sparks became the Regional Manager, he reviewed Plaintiff's record during the 60 day period with her and showed her that she had not improved in the targeted areas. He told her that she could not remain a gm and he gave her the choice of being terminated or demoted to an accounts manager (am) job at the Summerville store. Sparks told Plaintiff that she would be retrained, and, if her performance improved, she would be considered for a promotion the same as any other employee.[7] Sparks did not guarantee or promise that Plaintiff would be

_____

[7] Plaintiff argued that Sparks "promised" that she would be given another gm position, but Plaintiff deposed that Sparks never guaranteed she would be given a gm position. (Pl. brief at p.6; Pl. dep. 138, 139).

12

promoted to a gm position after retraining.  (Pl. Dep. p. 139).
Plaintiff chose the demotion to am.

During Plaintiff's employment as the am at the Summerville
store, several gm positions opened up and Plaintiff believed she
should have been promoted to one of them because she was the most
qualified associate.  Specifically, two jobs in Georgetown and
one job in Moncks Corner opened.  (Pl. Dep. at 248, Sparks Dep.
at 21-22).  The regional manager decides which qualified
employees will be offered the positions.  (Sparks Dep. at 21-22).
Plaintiff was not selected for any of these positions, and she
deposed that she was not retrained.  (Pl.'s Dep. at 229).

The three gm positions were filled by Jeffrey Miles, Brian
Malone, and James Cattenhead, all  male co-workers.  (Pl.'s Dep.
at 223-30).  Miles and Malone had previously worked under the
plaintiff when she was a gm.  (Pl.'s Dep. at 224, 232).  Unlike
Plaintiff, these male co-workers had never held a gm's position
with Defendant and none of them had been at the company as long
as the plaintiff.  (Pl.'s Dep. at 230).  Plaintiff believes that
she was not promoted because of her female gender, and she
believes that she was more qualified for the promotions than the
selectees because she had more seniority.  Plaintiff has no
evidence that seniority was a criteria used in evaluating who
would be selected for the gm position.

13

Additionally, Plaintiff has no evidence that Cattenhead, Malone, or Miles had any problem in their past performance or had received counseling for on the job behavioral issues like the plaintiff. (Pl.'s Dep. at  224, 232-33, 236).  Furthermore, Plaintiff did not know the complete educational and past work experience of the co-workers. (Pl.'s Dep. at 223-225, 233, 235-237).  The record indicates that Cattenhead has a bachelor's degree in Business Management, three years of prior management experience, had never received any negative performance evaluations, and had  worked for Defendant for approximately nine months prior to being promoted to gm on July 31, 2005. (Cattenhead Decl. ¶¶ 2-6).  Malone had a Bachelor of Science degree, had never received a negative performance evaluation, and had worked for Defendant approximately one year before being promoted to gm on May 9, 2005.  (Malone Decl. ¶¶ 2-5).  Miles had approximately 7 years of management experience, had never received any negative performance evaluations, and had been with Defendant for two years prior to his promotion to general manager on May 9, 2005.  (Miles Decl. ¶¶ 3-6).  Plaintiff completed high school and did not attend school thereafter.  (Pl. dep. p. 29).

In addition to the demotion, Plaintiff had other disciplinary actions taken against her.  In early 2004, Plaintiff received counseling for taking home a laptop computer.  (Pl's Dep. at 109-112, 130).  Plaintiff told co-workers, but not

14

Sparks, that she was taking the laptop home to reprogram to ready it for sale. (Pl.'s Dep. at 109-112, 130). Plaintiff was unable to adjust the computer so she brought it back to the store the next day. (Pl.'s 109-10.) Sparks asked Plaintiff why she removed the laptop, and Plaintiff handed the laptop over to Sparks with an explanation of why she removed it from the store. (Pl.'s Dep. at 109-10). Plaintiff received written counseling for the incident. (Pl.'s Dep. at 130). The defendant had a policy against removing merchandise from the store and, although Plaintiff was aware of the prohibition against removing store merchandise, she maintained that she did nothing improper. (Pl.'s Dep. at 112).

Plaintiff failed two consecutive "phone shops" around the same time and was counseled by her gm, Chris Hughes.

Thereafter, in another disciplinary incident, Plaintiff was going to purchase a televison from Defendant for her own personal use and her fiancé wrote on the television box "if you sell this I will kill you" which was directed at another employee in the store's warehouse. (Pl.'s Dep. at 124-26). While customers were allowed in the warehouse area to pick up merchandise or to shop for pre-leased items, an Aaron associate had to be present. (Pl.'s Dep. at 125). When Plaintiff's fiancé wrote on the box, the fiance' may have been improperly in the warehouse and was not

15

near the plaintiff. (Pl.'s Dep. at 126). Plaintiff was written up for this incident.

While the plaintiff was working at the Summerville store, she twice reported verbal abuse by Kevin Hunter. First Hunter improperly corrected the plaintiff in a loud voice for properly transferring a phone call to him concerning a bad debt owed to the store. (Pl.'s Dep. at 169-70). The second incident occurred when Hunter answered a telephone call from a caller who would not identify himself and who asked to speak directly with Plaintiff about the caller's account with the defendant. (Pl.'s Dep. at 164). Hunter told the caller that he handled all inquiries concerning customer's accounts. The caller insisted on speaking with the plaintiff so Hunter transferred the call to Plaintiff. (Pl.'s Dep. at 164). Plaintiff took the call and learned that the caller was her fiance's cousin who wanted to speak with her about a store purchase. (Pl.'s Dep. at 164-66). Later Hunter used obscenities when asking Plaintiff to identify who had called for her. Additionally, he yelled at the plaintiff in front of other co-workers and customers for taking a personal call on the store phone. (Pl.'s Dep. at 164-67). The defendant "discourages" employees from taking personal calls on the store phone, according to the plaintiff. (Pl.'s Dep. at 166-67). Plaintiff reported both of these incidents to her gm, but no

16

disciplinary action was taken against Hunter. (Pl.'s Dep. at 167-66).

On May 7, 2005, shortly after the incident involving the phone call, Plaintiff's fiancé came to the Summerville store to speak with Hunter about his profanity toward the plaintiff. (Pl.'s Dep. at 158; Def.'s Ex. 12). Plaintiff was not present when words were exchanged between Hunter and Plaintiff's fiancé. (Pl.'s Dep. at 158; Def.'s Ex. 12). Hunter told Plaintiff that her fiancé threatened him and also said something to the effect that if Plaintiff did not do as she was told, he would have her fired. (Pl.'s Dep. at 161, 190). Plaintiff's fiancé told the plaintiff that he merely told Hunter not to speak to Plaintiff unless it concerned work related matters. (Pl.'s Dep. at 161).

Nonetheless, Hunter felt physically threatened by the fiancé, filed a police report, and reported the incident to Plaintiff's assistant regional manager, George Stibitz. In turn, Stibitz told Plaintiff and Hunter to provide Hughes with written statements about the incident as part of an investigation. (Pl.'s Dep. at 173). Thereafter on May 9, 2005, Sparks investigated the matter because it involved a police report. (Sparks Dep. p. 77). Hughes and Sparks met separately with Hunter and Plaintiff and subsequently issued written counseling to both Hunter and Plaintiff.

17

Prior to Spark's investigation, on May 8, 2005, Plaintiff called Defendant's discrimination call center and complained that she was harassed by an employee four times, and that the harassment was being ignored by her gm. (Pl.'s Ex. 4; Sparks Dep. at 63). She reported that she was being treated unfairly by being targeted for disciplinary action for company policy infractions which she did not commit, and because Defendant twice failed to promote her back to a gm position in favor of less qualified employees. (Pl.'s Dep. at 175-78; Ex. 4).

On May 10, 2005, the call center contacted Sparks to investigate Plaintiff's complaint regarding harassment by Hunter. (Sparks Dep. at 41). Sparks was unaware of the call center complaint prior to May 10, 2005. (Spark's dep. p. 77). As regional manager, Sparks was responsible for investigating complaints in his region. (Sparks Dep. at 62, lines 2-25; at 63, lines 1-11). Sparks investigated the plaintiff's allegations of harassment by Hunter and transferred Hunter to another store. (Sparks Dep. at 43).

Sparks believed that Plaintiff's additional complaint was that it was unfair that she had not been promoted to gm; he did not understand that she attributed her non-promotion to gender discrimination. (Sparks dep. at 40-43; Pl. ex. 4). Greg Bellof, vice president of operations, and Venessa Adams, Defendant's senior employee relations specialist, decided Adams would

18

investigate Plaintiff's various allegations of non-promotion
because Sparks had been the decisionmaker in the complained of
promotions.   Adams deposed that she carefully investigated the
circumstances surrounding the promotions and determined that the
promotions were appropriate.   (Sparks Decl. ¶¶ 22, 23; Adams
Decl. ¶ 8).

Also, on May 9, 2005, Plaintiff admits she appropriately
received a written counseling for scoring zero on two phone shops
which occurred in February and April of 2005.   (Pl.'s Dep. at
151-52; Pl.'s Ex. 5; Def.'s Ex. 10-11).   Employees are required
to get at least a score of 70 on phone shops and are terminated
if they fail three phone shops.   (Pl. dep. p. 155, 156).   As a
result of the phone shop scores, Plaintiff was required to go to
a class on how to handle phone calls and was told that if she
received a zero on another phone shop she would be fired.   (Pl.'s
Dep. at 156-157; Pl.'s Ex. 5).

On June 9, 2005, Plaintiff was written up for violating
Defendant's Cash Management Policy for "shorting" a cash drawer.
(Pl.'s Dep. at 198-202, Def.'s Ex. 15, 16).   Defendant's policy
required those responsible for making bank deposits to balance
the store's bank account with the store's end of the day report.
(D. Ex. 16).   Plaintiff deposited into the store's bank account
$100 more than the amount on the bank slip which caused the
store's cash drawer to be $100 short.   (Pl.'s Dep. at 199-200).

Plaintiff's mistake did not involve any theft nor did it cost Defendant any money, but Plaintiff agrees that her actions violated company policy. (Sparks Dep. at 67).

Next, on July 4, 2005, Plaintiff was the designated employee responsible for opening the store in the morning because her gm had the day off. (Pl. dep. at 204). Plaintiff was 26 minutes late for work, and Sparks and two other employees waited locked out of the building. Due to Plaintiff's tardiness, the store was opened late. Plaintiff contends that the gm gave her permission to be late and that the gm forgot to indicate that on the schedule. (Pl.'s Dep. at 204; Pl.'s Ex. 8). Plaintiff received counseling for this incident and a written citation for violation of the store's attendance policy. (Pl.'s Ex. 8).

On August 2, 2005, Plaintiff wrote a letter to the Defendant's Department of Human Resources complaining of gender discrimination, (Pl.'s Ex. 10), but there is no evidence the letter was ever sent or that the Defendant ever received it. The Defendant denies receiving the letter and, therefore, did not investigate the complaint.

On August 10, 2005, Plaintiff received a Mini Sales Manager Audit of her performance as a sm and she met with her gm to discuss her performance. The audit's required passing grade was 70%; Plaintiff's score was 54%. (Pl.'s Dep. at 210; Def.'s Ex. 18; Sparks Decl. ¶ 24).

20

Defendant had a new store in New Jersey. Several offers of
a gm position in the store had been rejected by other associates.
Defendant's vice president of operations, Greg Bellof, and Sparks
made a decision to promote the Plaintiff to the gm position.
They reasoned that Plaintiff could be successful with the store
since the New Jersey store was smaller than the Charleston area
stores and therefore more manageable, and also was new so that
the performance expectations would be lower than for an
established store. (Pl.'s Dep. 216-17; Sparks Decl. ¶ 25).
Plaintiff declined the offer because she did not want to relocate
and because she believed that a gm position in a Charleston area
store would become available. (Pl.'s Dep. at 216-17; Sparks
Decl. ¶ 25). No such gm position opened and Plaintiff continued
to work at the Summerville store until she resigned on February
8, 2006. (Pl.'s Dep. at 213).

Defendant had a non-discriminatory policy in place during
all relevant times. (Pl. Dep. at 87-88). Defendant's non-
discrimination policy explicitly required employees to report
discrimination by calling a toll free 1-800 number to reach the
company's harassment and discrimination call center. (Def.'s Ex.
4). Among other prohibitions, the policy prohibited
discrimination on the basis of gender, and promised open
advancement within the company. (Def.'s Ex. 4). The policy also
assured Defendant's employees that their calls would be

21

confidential and that they would receive no retaliation for
reporting good faith violations of the policy. (Def.'s Ex. 4).
Furthermore, the policy stated reports of discrimination would be
"investigated and swift and appropriate remedial action" would be
taken if violations of the policy were discovered. (Def.'s Ex.
4). This non-discrimination policy was given to Plaintiff in a
written form on her first day of work with Defendant. (Pl.'s
Dep. at 87-88; Def.'s. Ex. 4). After receiving the policy,
Plaintiff signed it, thereby acknowledging that she read and
understood its terms. (Pl.'s Dep. at 87-88; Def.'s Ex. 4).
Plaintiff indicated that she understood this policy throughout
her employment with Defendant. (Pl.'s Dep. at 87-88; Sparks
Decl. ¶¶ 5,6; Def.'s Ex. B). Furthermore, a copy of this non-
discrimination policy was kept in the defendant's stores as part
of the policy manual and Pathway operation's manual. (Pl.'s Dep.
at 90, 95-96, Exs. 5, 6; Sparks Decl. ¶ 7). However, plaintiff
was also told by Paul Gaudegno[8] to go through her store's chain
of command by reporting discrimination to Plaintiff's gm and
regional manager. (Pl.'s Dep. 87-89).

## DISCUSSION

A review of the record and relevant case law indicates that
the defendant's motion for summary judgment should be granted on

---

[8] The record contains no indication what position this
person held.

22

all causes of action and this matter ended.

First, Plaintiff brought a discriminatory failure to promote cause of action under Title VII. The court will assume[9] that the plaintiff made out a prima facie case[10] of discrimination. However, the defendant is entitled to judgment as a matter of law because the plaintiff cannot rebut the defendant's articulated legitimate, nondiscriminatory reason for the decision not to promote Plaintiff to a gm position. Specifically the evidence does not rebut Plaintiff's relative work performance with Defendant, her relative educational qualifications, and her relative history of disciplinary problems.

The Plaintiff alleges that from the time of her demotion and transfer to the Summerville store until the time of her resignation, she should have been promoted to one of three gm positions in her region – two openings at the Georgetown store and one opening at the Moncks Corner store. (Pl. Dep. p. 248). Sparks made the decision to promote associates James Cattenhead, Brian Malone and Jeffrey Miles instead of the plaintiff. (Pl. Dep. p. 223; Sparks Dec. ¶ 26). It is undisputed that Sparks believed that each of these associates had better relative work

---

[9] The defendant does not contend that it is entitled to summary judgment for failure to make out a prima facie case.

[10] Plaintiff agreed that she has no direct evidence of discrimination based on her gender so circumstantial evidence is relied upon here. (Pl. Dep. pp. 229-30, 235).

performance with the defendant, had broader relative prior work experience, had more education than Plaintiff, and had not had performance and disciplinary problems. Plaintiff has no evidence that he was wrong. As such, Defendant has articulated a legitimate non-discriminatory reason for not promoting Plaintiff. See, Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) (holding that "[j]ob performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision."); Ellison v. First Citizens Bank & Trust Co., 149 F.3d 1168 (4th Cir. 1998)(holding that an individual with broader sales experience and a four-year degree were considered legitimate, nondiscriminatory reasons for not promoting the plaintiff).

Specifically, each of the male comparators attended and/or graduated from college, while Plaintiff did not. (Cattenhead Dec. ¶ 2; Miles Dec. ¶ 2; Malone Dec. ¶ 2; Sparks Dec. ¶¶ 27-29). Additionally, two of the three male comparators had at least three years of outside management experience working as a gm and/or branch manager for companies, while Plaintiff did not. (Cattenhead Dec. ¶ 4; Miles Dec. ¶ 4; Sparks Dec. ¶¶ 27, 29).

Further, it is uncontested that Plaintiff had disciplinary and performance problems of which the decisionmaker was aware. Plaintiff agrees that during the time that she was employed as

24

the gm at the North Charleston store, the store's performance was below the regional average in several important areas. (Pl. Dep. pp. 104-108). For instance, Plaintiff's percentage of revenue collected, was below the regional average for ten (10) of the thirteen (13) months that Plaintiff was employed as the gm. (Pl. Dep. p. 104, Def. ex. 8; Sparks Dec. ¶ 15). Under Plaintiff's management pretax profits, used to determine the profitability of an individual store, were considered unacceptable for ten (10) of the thirteen (13) months; four (4) of the thirteen (13) months were actually losses. (Pl. Dep., pp. 104-105, Ex. 8; Sparks Dec. ¶ 15, Def. ex. C). While plaintiff was gm, the store made only 764 customer deliveries while the regional average for the same period was 868 deliveries. (Pl. Dep., p. 106, Def. ex. 8). Likewise Plaintiff's month-end non-renewals were 60.4% versus a regional average of 46.5%.

Plaintiff selectively cites some other performance statistics which were better, but it is the decisionmaker, not the employee, who is entitled to assign relative importance to various of a store's statistics in making a decision to promote. Plaintiff's failure to perform her gm job adequately and the performance as well of those selected for the promotion remains a legitimate, non-discriminatory reason for the decision to promote others. See, James v. Int'l Paper Co., 215 F.3d 1319(4th Cir. 2000) (the failure of Plaintiff to perform his job adequately or

as well as those selected for the promotion is a legitimate, non-discriminatory reason for a decision not to promote.) Plaintiff failed to rebut the legitimate, non-discriminatory reason for the challenged decision. Similarly, Plaintiff cannot demonstrate pretext by showing that the real reason she was not promoted to a gm position was because she is female. Here, Plaintiff offers only the conclusory allegation that the men in the region were treated "totally different" than the women were and Plaintiff's belief that there was only one female gm in the region at that time.[11] (Pl. Dep. pp. 185, 230). That is simply not enough to overcome a legitimate non-discriminatory explanation or to defeat a well supported summary judgment motion.

Second, Plaintiff brought a cause of action for constructive discharge. Plaintiff has not shown that the defendant created working conditions which were intolerable, and she has not shown that a reasonable person in her position would have felt compelled to quit her job. See, Munday v. Waste Management of N. Am. Inc., 126 F.3d 239, 244 (4th Cir. 1997), cert. denied, 522 U.S. 1116 (1998); Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994). Indeed the plaintiff did not quit for many months. The

---

[11]  When Plaintiff was demoted, Wendi Watson and Devona Conyers both held gm jobs in the Carolina Coastal Region. (Sparks Dec. ¶ 20). Further, Sparks promoted Melinda McNair to the gm position at the Florence store two months after Plaintiff's resignation. (Sparks Dec. ¶ 20).

incidents alleged by Plaintiff do not objectively rise to the level of working conditions so intolerable that a reasonable person would be forced to resign.

Here, from the time of Plaintiff's demotion and transfer to the Summerville store until the time of her resignation, Plaintiff points to only three gm openings in her region. (Pl. Dep., p. 248). A failure to promote is insufficient in itself to result in a constructive discharge. See, e.g., Bristow v. Daily Press, Inc., 770 F.2d 1251, 1256 n. 4 (4th Cir. 1985)(holding that "[p]laintiff's history of alleged promotion denials preceding his resignation contributes nothing to his claim of constructive discharge."). As noted, Plaintiff did not resign her employment until more than six months after the last of these three gm positions in the region became available. This fact alone infers that the working conditions were not intolerable. (Pl. Dep. p. 213).

Plaintiff also fails to cite any evidence that she was subjected to unreasonably harsh working conditions in excess of those faced by her co-workers. See, James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 378 (4th Cir. 2004)(holding that a plaintiff claiming constructive discharge must establish the existence of a calculated effort to pressure her into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by co-workers). Instead, two months prior

27

to her resignation she was offered a gm position which she
declined.

Plaintiff has not shown that her working conditions were
imposed deliberately because the employer wanted her to quit.
"Deliberateness exists only if the actions complained of were
intended by the employer as an effort to force the plaintiff to
quit." Matvia v. Bald Head Island Management, Inc., 259 F.3d 261
at 272; Taylor v. Va. Union Univ., 193 F.3d 219, 237 (4th Cir.
1999). When measuring the tolerability of working conditions,
courts must employ an objective standard. See id.

Plaintiff has failed to present any evidence that the
actions of the defendant were intended to force her to quit.
"Dissatisfaction with work assignments, a feeling of being
unfairly criticized, or difficult or unpleasant working
conditions are not so intolerable as to compel a reasonable
person to resign." Carter at 459. Hence, the demotion and
denial of a gm position, and the counseling received for poor
performance or as discipline would not have compelled a
reasonable person to resign. These incidents might have made the
workplace less enjoyable for a reasonable person, but not
intolerable.

Third, Defendant is likewise entitled to summary judgment on
Plaintiff's claim that she was not promoted and constructively
discharged in retaliation for making a complaint of sex

28

discrimination.  Again, Plaintiff has no direct evidence of
retaliation so Plaintiff's retaliation claim is analyzed under
the circumstantial evidence test set forth in McDonnell Douglas.
See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th
Cir. 1998).  Defendant assumed that Plaintiff made out a prima
facie case of retaliation but correctly argued that, for all the
reasons cited previously, Plaintiff cannot show that the
defendant's non-promotion decision was a mere pretext for
retaliatory animus.

Plaintiff's protected activity was her May 9, 2005,
complaint to the defendant's discrimination hot line.  Plaintiff
was placed on the 60-day action plan before her demotion.  (Pl.
Dep. pp. 131-132).  Plaintiff also admits that she was verbally
counseled in regards to removing property from the store without
permission in violation of company policy prior to the hot line
telephone call.  (Pl. Dep. pp. 109-112, 130).  Plaintiff
was counseled regarding two incidents involving her fiancé, which
likewise occurred prior to engaging in any protected activity.
(Pl. Dep. pp. 123, 126-128).  Finally, Plaintiff admits that she
failed two consecutive phone shops, which were conducted by an
independent agency, prior to engaging in any protected activity.
(Pl. Dep. pp. 151-52, Def. exs. 9, 10, 11).  Accordingly, the

defendant is also entitled to summary judgment on Plaintiff's

retaliation claim.

Lastly, Plaintiff pled in the alternative that the defendant subjected her to a hostile environment in retaliation for her complaint of gender discrimination. The prima facie case of such a claims consists of the following: (1) the plaintiff engaged in protected activity; (2) the plaintiff was subjected to unwelcome harassment; (3) the unwelcome harassment was causally connected to the plaintiff's protected activity; (4) the harassment was severe and pervasive; and (5) a basis exists for imputing liability to the employer. Fleming v. South Carolina Dep't of Corrections, 952 F.Supp. 283 (D.S.C. 1996); see also, Davis v. California Dep't of Corrections, 1996 WL 271001, at 11 (E.D.Cal. Feb. 23, 1996) (plaintiff must meet following to make a prima facie case for retaliatory hostile environment: conduct reflecting retaliatory animus; that is unwelcome to recipient; that subjectively and objectively creates severe and pervasive hostility in the working environment; and imputed liability).

Again the plaintiff points to her disciplinary write ups after her complaint and the fact that she was not promoted after her complaint as the events which were motivated by retaliatory animus. Based on the foregoing conclusion that plaintiff was not promoted and was written up for legitimate reasons, these actions cannot be said to have the required retaliatory nexus. Nor can it be said that these actions were so extreme as to rise to the

30

high level of severity and pervasiveness, either objectively or subjectively, to alter the terms of her employment and create a workplace so abusive it was actionable under Title VII. E.E.O.C v. Sunbelt Rentals, Inc., 521 F.3d 306 (4th Cir. 2008).

In summary, it appears that the plaintiff cannot point to evidence sufficient for purposes of Rule 56 to create a genuine issue of material fact as to whether Defendant's legitimate, non-retaliatory reasons for its actions is the true reason or is merely pretext for a gender based or retaliatory reason. Thus, Defendants' motion for summary judgment should be granted.

## CONCLUSION

Accordingly, for the aforementioned reasons, it is recommended that the defendant's motion for summary judgment be granted.

Respectfully submitted,

Robert S. Carr
United States Magistrate Judge

Charleston, South Carolina

August 12, 2008

31